UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

| | |
|---|---|
| GERALD GORDON d/b/a INDIANA HONEY BEES, | |
| Plaintiff, | |
| v. | CAUSE NO.: 2:21-CV-292-TLS-JEM |
| KENNETH ANDREW FINCH d/b/a FINCH APIARY, RAYMOND MCCOY, and RYAN CUTTS, | |
| Defendants. | |
| KENNETH ANDREW FINCH d/b/a FINCH APIARY, RYAN CUTTS, and RAYMOND MCCOY, | |
| Counter-Claimants, | |
| v. | |
| GERALD GORDON d/b/a INDIANA HONEY BEES, | |
| Counter-Defendant | |

**OPINION AND ORDER**

This matter is before the Court on Plaintiff and Counter-Defendant Gerald Gordon's Motion to Dismiss Amended Counterclaim in Part [ECF No. 22]. The Defendants filed a response [ECF No. 28], and Gordon replied [ECF No. 30]. For the reasons set forth below, the Court grants in part and denies in part the motion.

**MOTION TO DISMISS STANDARD**

"A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) challenges the viability of a complaint by arguing that it fails to state a claim upon which relief may be

granted." *Camasta v. Jos. A. Bank Clothiers, Inc.*, 761 F.3d 732, 736 (7th Cir. 2014) (citing Fed. R. Civ. P. 12(b)(6); *Gen. Elec. Cap. Corp. v. Lease Resol. Corp.*, 128 F.3d 1074, 1080 (7th Cir. 1997)). When reviewing a complaint attacked by a Rule 12(b)(6) motion, a court construes the complaint in the light most favorable to the non-moving party, accepts the factual allegations as true, and draws all inferences in the non-moving party's favor. *Bell v. City of Chicago*, 835 F.3d 736, 738 (7th Cir. 2016). "Factual allegations must be enough to raise a right to relief above the speculative level . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556).

## FACTUAL AND PROCEDURAL BACKGROUND

Defendants and Counter-Claimants Andrew Finch, Raymond McCoy, and Ryan Cutts bring this counterclaim against Plaintiff and Counter-Defendant Gerald Gordon in relation to a contract in which the Plaintiff agreed to purchase bees from Defendant Finch. Am. Countercl. at 24, ¶ 1(b), ECF No. 21. Gordon buys "nucs," or nucleus bee colonies, from suppliers and retails them to customers individually or in lots. *Id.* at 25, ¶ 4(b). In the agreement at issue here, Gordon agreed to purchase 800 nucs from Finch for a total purchase price of $88,000. *Id.* at 24, ¶ 1(b). Finch contracted with McCoy and Cutts separately to act as suppliers to Finch. *Id.*

In 2019, fulfilling a previous order, Finch and Cutts delivered 500 nucs, plus extra, to Gordon without incident. *Id.* at 25, ¶ 4(c). During dinner after the delivery, Cutts explained his beekeeping business to Gordon, including that he owned a separate business from Finch. *Id.* The Defendants allege that Gordon was clearly aware Cutts would be paid as a beneficiary to any and all contracts between Gordon and Finch. *Id.* at 26, ¶ 4(c).

The Plaintiff purchased another 500 nucs from Finch and Cutts in 2020, prior to the order at issue here. *Id.* at 26, ¶ 4(d). The Defendants allege that Finch sourced nucs from Cutts with Gordon's "knowledge and consent," with "subsequent payment to Cutts being known and intended by all parties." *Id.*

Upon delivery of the nucs to Gordon, there were a few minor issues. *Id.* at 26, ¶ 4(f). Gordon was present and approved of measures to fix the issues, including swapping frames to equal out the somewhat stronger and slightly weaker nucs, which is a common practice in the industry. *Id.* Gordon rejected no more than five nucs. *Id.* The Defendants had already provided 14 extra nucs. *Id.* The Defendants allege that Finch and Cutts left because the delivery was complete, and according to Gordon, satisfactory. *Id.* at 26, ¶ 4(g). Hours after they left, however, Gordon contacted Finch and complained about 48 nucs he claimed were unacceptable. *Id.* Finch told Gordon he would return to Indiana to inspect the alleged problem and otherwise resolve the issue. *Id.* at 26, ¶ 4(h).

The Defendants allege that the number of nucs Gordon claimed were bad would vary from day to day and that by the time Finch left to inspect them, Gordon had lowered the amount of "unacceptable" nucs from 48 to 25. *Id.* at 26, ¶ 4(i). Based on Gordon's complaints, Finch returned with approximately 25 nucs and a queen bee for each. *Id.* When Finch arrived, Gordon presented only 13 nucs with problems. *Id.* at 27, ¶ 4(j). The Defendants allege that upon inspection, five of the 13 remained in high-quality condition, so Finch took them home for his own use. *Id.* Based on this experience, and to avoid unwarranted complaints and remedial measures, Finch and Cutts determined they would no longer deliver bees to Gordon in Indiana without Gordon inspecting them at Finch's apiary in Mississippi first. *Id.* at 27, ¶ 4(m).

Regarding the order at issue here, the Defendants allege, "Under the statement and promise of Gordon to inspect in Mississippi, Finch offered to supply even more bees, up to 800, which he would source from Cutts and McCoy, each to be paid from the proceeds of the contract." *Id.* at 27, ¶ 4(p). In October 2020, the Defendants agreed to produce 800 nucs and have

3

them available for Gordon's inspection and loading in Mississippi. *Id.* at 28, ¶ 4(t). Gordon agreed to pay $88,000 in exchange for the nucs. *Id.* at 29, ¶ 4(u). The Defendants attached to their counterclaim "Exhibit 1 – Emailed Contract Terms," which is an email that appears to be from Defendant Finch to Gordon and which reads, in part:

> Per our previous conversation I have agreed to provide 800 (5) frame nucleus colonies to you the last week of April 2021, weather permitting. As we have previously discussed you will come down and inspect/pick out the nucs you want. I have agreed to assist you transport these nucleus colonies back to your home in Lake Village Indiana. All nucleus colonies will be housed in Jester Ez Nucs, as long as supplies are available. I will provide 15 extra nucleus colonies and 15 extra queens.
>
> In past years I have requested a 10% deposit, however, due to the need to bring in another partner to ensure we have an adequate supply of excellent honey bees and the increase price of bee equipment I will need a deposit of 20% down of the grand total of 88,000. If you have any questions or concerns please call me. I look forward to doing business with you!

ECF No. 21-1.

The Defendants began producing the 800 nucs in February 2021. Am. Countercl. at 29, ¶ 4(v). On February 27, 2021, Gordon stated he would make the inspection visit in April. *Id.* at 29, ¶ 4(w). In March of 2021, Finch tried to secure a date for the inspection, but Gordon did not give a date, claiming medical issues and assuring he would know more a week later. *Id.* at 29, ¶ 4(x). On April 1, 2021, Gordon advised that he would "probably not make it" to the inspection. *Id.* at 29, ¶ 4(y). By this time, the nucs were nearly ready for delivery and Gordon had paid 62% of the purchase price. *Id.* at 29, ¶ 4(z). Finch informed Cutts and McCoy that Gordon would not go to Mississippi for the inspection, and they agreed to deliver the bees to Indiana because they had no other choice. *Id.* at 29–30, ¶ 4(z). On April 29–30, 2021, the Defendants delivered 814 nucs. *Id.* at 30, ¶ 4(aa). Finch delivered an additional 80 queen bees, 50 of which Gordon ordered to sell at retail and 30 to replace any queens that may have died in transit or were not laying. *Id.*

The Defendants allege that after delivery of the nucs, Gordon damaged them by way of negligent inspection, keeping, and distribution. *Id.* at 30, ¶ 4(cc). Specifically, they allege

4

Gordon did not provide adequate space for 800 nucs and placed them too close together. *Id.* at 30, ¶ 4(dd)(i). With an unsustainable number of bees in a small area, the bees lacked nutrients and resources. *Id.* The placement also caused drift, wherein bees from nucs in the middle of rows would drift to nucs on the outside edges of the rows. *Id.* They allege that Gordon told Finch the night before delivery that he did not have any feed on hand, and that he did not supply the bees with feed. *Id.* at 30, ¶ 4(dd)(ii). Malnutrition and starvation may have led to agitation and aggression. *Id.* at 30–31, ¶ 4(dd)(ii). They allege Gordon did not have smokers on the bees' arrival, which are necessary to mask the bee pheromone that produces alarm and aggression. *Id.* at 31, ¶ 4(dd)(iii). They allege that despite the temperature being in the mid-forties upon delivery, Gordon's "people" began opening nucs, which can cause bee mortality and destructive brood chilling or give the appearance of brood disease. *Id.* at 31, ¶ 4(dd)(iv). And, the Defendants allege Gordon did not allow the bees to be picked up by customers for eight or more days, leaving the bees in an over-crowded and under-resourced environment. *Id.* at 31, ¶ 4(dd)(v).

After delivering the nucs on April 29, 2021, Finch told Gordon that if he did not want the bees for any reason, Finch would take them back, but that if he would accept the bees and pay the $33,000 balance of their agreement, Finch would leave the bees with him. *Id.* at 33, ¶ 4(rr). Gordon stated he wanted the bees and would pay for them. *Id.* Gordon rejected 14 of McCoy's nucs and 8 of Cutts' nucs. *Id.* at 31, ¶ 4(ff). Finch supplied an additional 24 to cover the rejections. *Id.* Gordon paid $55,000 of the agreed upon $88,000 for the 800 nucs, 80 additional queen bees, and 24 replacement nucs. *Id.* at 32, ¶ 4(gg). The Defendants allege Gordon kept the bees and sold them at a profit that exceeded the $33,000 still owed under the contract. *Id.* at 33, ¶ 4(tt). Gordon sold the bees without Finch's ratification of Gordon's acceptance. *Id.* at 34, ¶ 4(ww). Gordon did not allow Finch to reclaim any portion of the delivered bees. *Id.* at 34, ¶ 4(xx). Nor did he make reasonable efforts to sell the bees for the sake of paying Finch. *Id.* at 34, ¶ 4(yy). Gordon did not make any clear objection to the delivery. *Id.* at 34, ¶ 4(zz). The

Defendants allege that Finch was precluded from recovering any of the delivered product because Gordon did not fulfill his promise to disclose to Finch a "report" Gordon ordered to detail the alleged defects in the delivery. *Id.* at 34, ¶ 4(aaa).

The Defendants allege that Gordon knew and intended to make McCoy and Cutts third-party beneficiaries of the contract between him and Finch. *Id.* at 32, ¶ 4(hh). The Defendants allege that McCoy and Cutts were independent contractors of Finch, intended by Gordon and Finch to be paid for their services. *Id.*

The Defendants bring the instant counterclaim against Gordon regarding the above-detailed delivery of 800 nucs to Gordon and outstanding $33,000 balance of the related contract. Because of Gordon's failure to inspect in Mississippi and failure to pay the balance of the contract, the Defendants claim fraud in the inducement, common law fraud, relief from fraud under the Indiana Crime Victim's Relief Act, and damages in the amount of $110,580, plus costs and attorney fees. The Defendants also claim breach of contract, for which they demand damages including the remaining balance of the contract, rescission, and consequential damages. They claim Gordon violated Indiana's version of the Uniform Commercial Code (UCC), entitling them to incidental or consequential damages under the UCC, as well as damages cited under Indiana Code Title 26. Last, the Defendants claim promissory estoppel, that the Defendants reasonably expected to be paid the remaining $33,000 of the contract for the bees they supplied and Gordon promised to pay for.

In Gordon's Motion to Dismiss Amended Counterclaim in Part [ECF No. 22], he seeks to dismiss the Defendants' counterclaim as to McCoy and Cutts for lack of standing. He also argues the Defendants' promissory estoppel claim fails to state a claim as required by Federal Rule of Civil Procedure 12(b)(6). He moves to dismiss the Defendants' fraud claims for failure to comply with the heightened pleading standards of Federal Rule of Civil Procedure 9(b) and for failure to state a claim. Gordon moves to dismiss the Defendants' claim for conversion and relief under the Indiana Crime Victims Relief Act as a matter of law under Rule 12(b)(6) and because,

he claims, the Defendants have restyled a contract claim as a tort claim to obtain additional damages. Last, Gordon moves to dismiss or strike the Defendants' request for rescission because it is not available to them when their counterclaim allegations are taken as true.

## ANALYSIS

The Court applies Indiana substantive law because the instant claims are brought under the court's diversity jurisdiction. *See Webber v. Butner*, 923 F.3d 479, 480–81 (7th Cir. 2019) ("This case is in federal court under diversity jurisdiction, *see* 28 U.S.C § 1332, so we apply Indiana substantive . . . law . . . .").

**A.  Whether McCoy and Cutts Have Standing**

Gordon argues that McCoy and Cutts do not have standing to bring their counterclaims for breach of contract, fraud, conversion, and statutory damages because they are not parties to the contract between Gordon and Finch, nor are they third party beneficiaries of the contract. The Court concludes that McCoy and Cutts were third-party beneficiaries. They may seek to enforce the contract by way of their counterclaims.

"Generally, only parties to a contract or those in privity with them have the right to recover under a contract." *Luhnow v. Horn*, 760 N.E.2d 621, 628 (Ind. Ct. App. 2001) (citation omitted). Non-parties to a contract may nonetheless "enforce the contract if they demonstrate that they are third-party beneficiaries" of it. *Id.* (citation omitted). McCoy and Cutts do not allege that they are a privy to the contract between Gordon and Finch. They do allege in their counterclaim, however, that they "were known and intended by Gordon to be third party beneficiaries of the contract between Finch and Gordon." Gordon argues that McCoy and Cutts have failed to make the required showings for a third-party beneficiary. The Court disagrees.

To demonstrate one is a third-party beneficiary, a party must show:

> (1) A clear intent by the actual parties to the contract to benefit the third party;
> (2) A duty imposed on one of the contracting parties in favor of the third party; *and*
> (3) Performance of the contract terms is necessary to render the third party a direct benefit intended by the parties to the contract.

*Id.* (citation omitted).

The Indiana Court of Appeals has held that "the intent to benefit the third party is the controlling factor and may be shown by specifically naming the third party or by other evidence." *Id.* (citation omitted); *see also Mogensen v. Martz*, 441 N.E.2d 34, 35 (Ind. Ct. App. 1982) (explaining that intent to benefit a third party may be shown by "other evidence demonstrating the intent or understanding of the parties"). Intent to benefit a third party "may be shown by naming a specific [third party] or [third-parties] as a class." *Mogensen*, 441 N.E.2d at 35. The contracting parties' intent "should be gathered from the terms of the contract itself, considered in its entirety against the background of the circumstances known to and shown to surround the contracting parties at the time of its execution." *Jackman Cigar Mfg. Co. v. John Berger & Son Co.*, 52 N.E.2d 363, 367 (Ind. Ct. App. 1944) (citations omitted).

The Defendants submit with their counterclaim an email attached as "Exhibit 1 – Emailed Contract Terms." ECF No. 21-1. The body of the email constitutes two paragraphs, the first of which details the agreed upon number of nucs and the inspection. *Id.* at 2. The second paragraph reads, in part:

> In past years I have requested a 10% deposit, however, due to the need to bring in another partner to ensure we have an adequate supply of excellent honey bees and the increase[d] price of bee equipment I will need a deposit of 20% down of the grand total of 88,000.

*Id.*

Neither McCoy nor Cutts are specifically named in the alleged contract. The question for the Court, then, is whether the contract's request for a higher deposit "due to the need to bring in another partner to ensure we have an adequate supply of excellent honey bees," is enough to create a "clear intent" by the parties to benefit McCoy and Cutts. Indiana case law suggests it is.

8

The contract required that Gordon pay Finch a higher deposit than in the past because he needed to bring on "another partner" who would help "supply" honey bees for Gordon's order. The terms thereby name a class to which McCoy and Cutts belong: a partner who supplies honey bees. *See Mogensen*, 441 N.E.2d at 35 (explaining that intent "may be shown by naming a specific [third party] or [third-parties] as a class"). Further, in *Luhnow*, the Indiana Court of Appeals implied that a contract may establish a third-party beneficiary if it contains any "provisions which demonstrate an intent to benefit any other person" than the two contracting parties. 760 N.E.2d at 628–29 (concluding "the contract does not show a clear intent to directly benefit" a third party because "the contract addresses only the rights and obligations of the two contracting parties; *it contains no provisions which demonstrate an intent to benefit any other person*" (emphasis added)); *see also Eckman v. Green*, 869 N.E.2d 493, 496 (Ind. Ct. App. 2007) ("The purchase agreement between the Eckmans and New Welton does not show clear intent to benefit Green as Green is neither named in the purchase agreement nor does the purchase agreement contain *provisions which demonstrate an intent to benefit any other person*." (emphasis added) (quotation marks and citation omitted)). Here, the contract includes such a provision demonstrating an intent to benefit a third party. Specifically, the email memorializing the parties' agreement states, "due to the need to bring in *another partner* to ensure we have an adequate supply of excellent honey bees and the increase price of bee equipment I will need a deposit of 20% down," instead of the usual 10% deposit. By naming McCoy and Cutts as a class and including a provision demonstrating an intent to pay them as part of the contemplated exchange, the parties have shown a clear intent to benefit McCoy and Cutts.

The alleged contract terms plainly satisfy the remaining two requirements for demonstrating a third-party beneficiary. Finch's request that Gordon pay a 20% deposit instead

of a 10% deposit is a "duty imposed on one of the contracting parties in favor of the third party." The request imposes a duty upon Gordon to pay an increased deposit for the benefit of Finch's partner, who would supply honey bees. Last, performance is necessary to render the third party a direct benefit because the terms demonstrate Finch's "need" for a deposit of 20% down instead of the usual 10%, suggesting that Gordon's increased deposit is necessary to Finch's ability to "bring in another partner." McCoy and Cutts have pled facts sufficient to show they are third-party beneficiaries and have standing to bring their breach of contract counterclaims against Gordon.

Although the Defendants' counterclaims for fraud, conversion, and statutory damages do not seek to enforce the contract, McCoy and Cutts nonetheless have standing to bring them under Article III of the United States Constitution. To determine whether a party has standing under Article III, the Court "asks whether the complaint 'clearly allege[s] facts' demonstrating [the party] has '(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision.'" *Nettles v. Midland Funding LLC*, 983 F.3d 896, 899 (7th Cir. 2020) (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016)). McCoy and Cutts have sufficiently alleged an injury in fact: bearing the cost of an inspection in Indiana instead of Mississippi and delivering honey bees without payment. They allege their injuries were caused by Gordon's failure to inspect in Mississippi and failure to pay for the delivered honey bees. Should the Court determine that Gordon is liable for fraud or conversion, McCoy and Cutts would be entitled to recover damages for their alleged injuries. Thus, McCoy and Cutts have standing to bring their counterclaims for fraud, conversion, and statutory damages.

B.     **Promissory Estoppel**

Gordon moves to dismiss the Defendants' promissory estoppel claim as "redundant and superseded by [the] contractual claim." The Defendants respond that "a cognizable promissory estoppel claim is proper" based on statements Gordon made to the Defendants. However, the Defendants also allege there was a contract between Gordon and Finch. *See* Am. Countercl. at 24–25, ¶¶ 1(b)–(c); ECF No. 21-1.

Promissory estoppel binds a promisor to "a promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance . . . if injustice can be avoided only by the enforcement of the promise." *Hinkel v. Sataria Distrib. & Packaging, Inc.*, 920 N.E.2d 766, 771 (Ind. Ct. App. 2010) (quotation marks and citation omitted). "Promissory estoppel permits recovery where no contract in fact exists." *Id.* (citation omitted). A promissory estoppel claim "founded on a valid written contract between the parties" becomes "unwanted surplusage" and should be dismissed. *Decature Ventures, LLC v. Stapleton Ventures, Inc.*, 373 F. Supp. 2d 829, 848 (S.D. Ind. 2005) (citing *Meisenhelder v. Zipp Exp., Inc.*, 788 N.E.2d 924, 932 (Ind. Ct. App. 2003)).

Here, the Defendants have alleged that a contract exists between Gordon and Finch. The Defendants' promissory estoppel counterclaim is based on the promises in that contract and must be dismissed. *See id.* at 848–49 (dismissing a promissory estoppel claim because the plaintiffs attached copies of their contracts to their complaint and the defendant did not dispute the validity of the contracts); *Meisenhelder*, 788 N.E.2d at 932 (concluding that a promissory estoppel claim failed because it was based on a promise embodied in a written employment contract). The Court thus dismisses the Defendants' counterclaim for promissory estoppel.

C.      **Fraud in the Inducement, Common Law Fraud, and the Indiana Crime Victims Relief Act**

11

The Defendants' assert counterclaims for fraud in the inducement and common law fraud based on Gordon's statements that he would keep the bees and pay for them, and that he would inspect the nucs in Mississippi. Gordon moves to dismiss the Defendants' counterclaims for fraud because "it is well-settled that fraud may not be premised upon representations of future conduct, on broken promises, or on representations of existing intent that is not executed." *Munster Steel Co. v. Crane 1 Servs., Inc.*, No. 2:16-CV-345, 2018 WL 620382, at *3 (N.D. Ind. Jan. 30, 2018) (quotation marks and citation omitted). The Defendants' only response to this argument is that "given the alleged facts . . . the Court must allow all fraud claims to proceed, or dismiss the fraud claims of all parties." ECF No. 29 at 19.

Where "a plaintiff alleges both a breach of contract claim and a fraud claim, the tort of fraud must be 'separate and independent' from the contract claim, and the injury sustained from the tort must be 'distinct' from the injury suffered as a result of the breach of contract." *Munster Steel Co.*, 2018 WL 620382, at *2 (citation omitted). The Defendants' counterclaims for fraud are not "separate and independent" from their contract counterclaims.

The Defendants' counterclaim for breach of contract alleges that Gordon "failed to perform one or more promises required under his contract with Finch." Am. Countercl. at 36, ¶ 14. The Defendants allege that Gordon contracted to inspect the nucs in Mississippi, which Gordon did not do, and to pay $88,000 for 800 nucs, of which the Plaintiff has yet to pay $33,000. The Defendants allege the same wrongdoing in their counterclaims for fraud: Gordon represented he would inspect in Mississippi but did not, and Gordon said he would pay $88,000 for 8000 nucs but has withheld $33,000. The Defendants' claims for fraud are thus premised upon "representations of future conduct" and "broken promises," *see Munster Steel Co.*, 2018 WL 620382, at *3, and they are not "separate and independent" claims from their breach of

12

contract claim, *see id.* at *2. Therefore, the Court grants Gordon's motion to dismiss the Defendants' counterclaims for fraud in the inducement and common law fraud.

Having granted Gordon's motion to dismiss the Defendants' counterclaims for fraud, their claim for treble damages, costs, and attorney fees under the Indiana Crime Victim's Relief Act must also be dismissed. For the Defendants to obtain relief under the Indiana Crime Victim's Relief Act, they must allege that they suffered from a predicate criminal offense. *See* Ind. Code § 34-24-3-1 ("If a person . . . suffers a pecuniary loss as a result of a violation of IC 35-43, IC 35-42-3-3, IC 35-42-3-4, IC 35-45-9, or IC 35-46-10, the person may bring a civil action against the person who caused the loss . . . ."). The Defendants have not alleged that Gordon committed any predicate criminal offense other than fraud.

**D.   Conversion**

In the Defendants' initial Counterclaim, they alleged that the "Plaintiff is liable to Defendants for . . . conversion," in the claim that was titled, in part, "Common Law Fraud and Conversion." Countercl. at 31, ¶ 8, ECF No. 8. In the Amended Counterclaim, however, they removed that allegation and claim. Instead, they allege the following, in the alternative, under the claim that is titled, "Violations of the Uniform Commercial Code" (UCC): "Gordon rejected the goods, and then converted them to his own use without lawful cause," and Gordon's "conversion, sale and use of rejected goods without cause violates Indiana's version of the Uniform Commercial Code." Am. Countercl. at 37, ¶ 19. In Gordon's Motion to Dismiss, he argues that any claim for conversion remaining in the Amended Counterclaim should be dismissed because "a party may not restyle a breach-of-contract claim as a tort claim simply to obtain additional damages." *JPMCC 2006-CIBC14 EADS Parkway, LLC v. DBL Axel, LLC*, 977

13

N.E.2d 354, 364 (Ind. Ct. App. 2012) (citation omitted). Gordon also argues that the Defendants cannot state a plausible claim for criminal conversion.

The Defendants did not respond to Gordon's arguments regarding conversion and therefore waive their counterclaim for conversion. *See County of McHenry v. Ins. Co. of the W.*, 438 F.3d 813, 818 (7th Cir. 2006) ("When presented with a motion to dismiss, the non-moving party must proffer some legal basis to support his cause of action." (citation omitted)); *Jimerson v. Harris*, No. 2:15-CV-178, 2018 WL 339230, at *2 (N.D. Ind. Jan. 5, 2018) ("Failure to respond to an argument presented in a motion to dismiss results in waiver." (citing *Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010))). The Court grants Gordon's motion to dismiss the Defendants' counterclaim for conversion under the UCC. The Defendants' other counterclaim brought under the UCC, asserting that Gordon violated Indiana's UCC by accepting and selling goods without paying for them, remains pending against Gordon.

**E.     Rescission as a Remedy for Breach of Contract**

Gordon moves to dismiss the Defendants' claim for rescission as a remedy for their breach of contract counterclaim. He argues that the counterclaim fails to allege facts that support rescission as a plausible remedy because the Defendants "have not alleged that they are willing or able to return Gordon's payment, and they specifically allege that Gordon sold and disposed of the bees." Pl. Br. 19–20, ECF No. 22-1 (citing *Blaising v. Mills*, 374 N.E.2d 1166, 1172 (Ind. Ct. App. 1978) ("When a party elects to rescind the contract, a return of the parties to the status quo usually requires the party in possession to return the property received under the contract . . . ." (citation omitted)). Again, the Defendants did not respond to these arguments and have thus waived their claim for rescission. *See Jimerson*, 2018 WL 339230, at *2 ("Failure to respond to an argument presented in a motion to dismiss results in waiver." (citation omitted)). The Court

grants Gordon's motion to dismiss the Defendants' claim for rescission. The Defendants' other contract-related counterclaims for breach, for the unpaid price of the contract, and for consequential damages remain pending against Gordon.

## CONCLUSION

For the reasons stated above, the Court hereby GRANTS in part and DENIES in part Gordon's Motion to Dismiss Amended Counterclaim in Part [ECF No. 22], denying the motion to dismiss Defendants McCoy and Cutts as Counter-Claimants for lack of standing and granting the motion as to the Defendants' counterclaims for promissory estoppel, fraud in the inducement, common law fraud, relief under the Indiana Crime Victim's Relief Act, conversion, and rescission. The Defendants' counterclaims for breach of contract and violations of Indiana's Uniform Commercial Code remain pending against Gordon as explained above.

SO ORDERED on April 28, 2023.

        s/ Theresa L. Springmann
JUDGE THERESA L. SPRINGMANN
UNITED STATES DISTRICT COURT